UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| **BRADLEY STEVEN ADAMS,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**CITY OF WHITTIER, ALASKA,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CASE NO: 3:26-cv-00337-ACP**<br><br>**JUDGE: Aaron Christian Peterson**<br><br>**COMPLAINT FOR DAMAGES AND JURY DEMAMD** |

## COMPLAINT AND JURY DEMAND

Plaintiff Bradley Steven Adams ("Mr. Adams"), by and through his undersigned counsel, alleges:

## NATURE OF THIS ACTION

1. This is a civil action brought pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §4301-4335 ("USERRA"). It is brought by Mr. Adams against the City of Whittier, Alaska ("the City").

2. Pursuant to 38 U.S.C. §4323(h)(1), "No fees or court costs may be charged or taxed against any person claiming rights under [USERRA]".

## JURISDICTION AND VENUE

3. The Court has jurisdiction over the subject matter of this civil action founded upon federal question jurisdiction, 28 U.S.C. §1331, as conferred by actions arising under USERRA, 38 U.S.C. §4323(b)(1).

4. Venue is proper in this judicial district because Defendant is a political subdivision of the State of Alaska and is treated as a "private employer" for purposes of USERRA enforcement as provided in 38 U.S.C. §4323(i) and 28 U.S.C. §1391(b).

## PARTIES

5. Plaintiff Bradley Steven Adams is a citizen of the United States and a resident of the state of Alaska.

6. Defendant the City is an Alaska municipal corporation and political subdivision and is an "employer" for the purposes of 38 U.S.C. § 4303(4)(A) and is subject to suit under USERRA § 4323(a).

7. Mr. Adams was at all pertinent times alleged herein employed by Defendant WHITTIER and also served in the Alaska Army National Guard ("AKARNG") as a Combat Medic, holding the rank of Specialist (E-4). Plaintiff is a qualified employee and member of the uniformed services for purposes of 38 U.S.C. §4303(3), (9), and (16).

8. Whenever and wherever reference is made to individuals who are not named as defendants in this action, but were employees/agents of defendant, or any of them herein, such individuals at all times acted on behalf of the defendants named in this action within the scope of their respective employments and agencies.

9. Whenever and wherever reference is made in this Complaint to any conduct of defendants, or any of them, such allegations or references shall also be deemed to mean the conduct of each defendant, acting individually, jointly and severally.

10. Plaintiff is informed and believes, and on the basis of that information and belief, alleges that all times mentioned in this Complaint, defendants were the agents and employees of

their codefendants, and in doing the things alleged in this Complaint were acting within the course and scope of that agency and employment.

**GENERAL ALLEGATIONS**

11. Mr. Adams realleges and incorporates herein by reference each and every allegation contained within paragraphs 1 through 10, inclusive, as though set forth at length herein and made a part hereof.

12. The City of Whittier is an Alaska municipal corporation and political subdivision that operates the Whittier Police Department ("WPD").

13. As a member of the AKARNG, Mr. Adams performed periods of military service, such as monthly inactive duty training periods, more commonly known as "battle assemblies;" annual training periods, and additional periods of active-duty service as required for operational support and career progression.

14. Mr. Adams began working for WPD as a police officer on July 8, 2024. He satisfactorily performed his duties, received a positive performance evaluation, and had not been disciplined for dishonesty, false statements, or comparable misconduct before the events giving rise to this action.

15. As an employee, Mr. Adams received approximately $36.48 per hour, overtime opportunities, biweekly on-call compensation, and other employment benefits. He participated in Alaska's PERS Defined Contribution Retirement Plan, under which he contributed eight percent of his compensation and WHITTIER contributed five percent to his retirement account. The PERS plan also provided employer-funded health-reimbursement, retiree-medical, and occupational death-and-disability benefits.

16. On October 9, 2025, Mr. Adams notified the City of his upcoming AKARNG duty.

17. On October 21, Chief Andre Achee subjected Mr. Adams to what the City later described as a "disciplinary step (verbal counseling)" concerning the timing of that notice. Chief Achee also directed Mr. Adams to obtain a written explanation from his military command concerning the scheduling of his military duty.

18. On October 22, 2025, Mr. Adams filed a written grievance alleging that Chief Achee's treatment of his military-leave notice violated USERRA.

19. On October 27, 2025, the City sustained Mr. Adams's grievance. Its written determination stated that Mr. Adams's notice "constituted reasonable advance notice under the law," that "USERRA does not require employees to provide military orders or justification for scheduling delays," and that Chief Achee's demand for a written command explanation and verbal warning "were inconsistent with USERRA requirements."

20. The City directed Chief Achee to review USERRA guidance and available human-resources materials. The grievance and written decision placed Chief Achee, WPD management, and the City's human-resources personnel on actual notice of Mr. Adams's USERRA rights.

21. On November 6, 2025, Mr. Adams's AKARNG unit circulated a request asking whether there was "any interest" in a possible state emergency-response mission and instructed interested soldiers to respond. Mr. Adams answered: "I'm interested, I'll just need to see how many days it is before I confirm."

22. Mr. Adams had not confirmed his participation. He had not received orders, been given a departure date, or been informed that he had been selected.

23. On November 10, 2025, Mr. Adams attended a meeting with his AKARNG unit and learned that he had been selected and would depart on November 12, 2025.

24. Mr. Adams promptly notified WPD by email to the entire patrol department: "Just

giving you all a heads up that I got called up for state active orders for OPERATION HALONG. I'm flying out on a C-130 Wednesday at 0600, so I won't be able to make it at all this rotation. I'll return November 26th." Mr. Adams also notified Chief Achee and WPD Lieutenant Jerry Herrod by telephone on November 10th.

25. The Alaska Department of Military and Veterans Affairs thereafter documented that Mr. Adams was "ordered into the active military service" of Alaska under Alaska Stat. § 26.05.070. The orders identified November 10, 2025, as the reporting date, November 26, 2025, as the end date, and "Fall Sea Storms 2025" as the mission.

26. Mr. Adams performed his military service and thereafter returned to his employment with WPD to be on-call for shift on November 25, 2025, and then worked his next scheduled shift on November 26, 2025.

27. On January 8, 2026, Lt. Herrod initiated an internal investigation accusing Mr. Adams of "false statements" and dishonesty concerning the November military assignment.

28. Lt. Herrod, a participant and witness to the disputed November 10th conversation involving Mr. Adams, named himself the investigating offer of the internal investigation into Mr. Adams.

29. The Notice of Investigation stated:

> "Ofc. Bradley Adams was dishonest/lied when notifying the department of his National Guard assignment in November of 2025. Ofc. Adams stated in a department wide email that he was being 'called up' for deployment for Bethel, AK disaster relief efforts and the department was given 48 hours notice. A subsequent complaint was made internally against Ofc. Adams with information that suggested Ofc. Adams had at least one week advance notice of his assignment to Bethel because he volunteered for it. Ofc. Adams maintained that he was being sent on orders but withheld the information about volunteering for the assignment and was not truthful to supervision when he was asked when he knew he was going to be deployed."

30. The Notice did not allege that Mr. Adams fabricated his orders, misstated his dates

of service, failed to perform the assignment, or falsely claimed that he was required to report after receiving orders. The allegation rested on the premise that expressing interest in a possible assignment was inconsistent with later being called to duty under military orders.

31. Before interviewing Mr. Adams, Herrod prepared an "Executive Summary" as the investigating supervisor for Internal Affairs Case No. 25-1201. The document purported to summarize the internal review, but it did not identify its formal purpose beyond that function. It nevertheless announced as established facts that "Bradley Adams misrepresented his national guard orders to the department," that he "withheld the prior knowledge" of the deployment, and that he "maintained throughout that he was being ordered to go." Only after making those findings did the summary state: "A formal interview with Bradley Adams is pending."

32. The executive summary also stated that Mr. Adams's absence "created a hardship with staffing and scheduling" and that WPD had "made accommodations for Adams and rescheduled other employees' duties" because of USERRA.

33. On January 9, 2026, the City interviewed Mr. Adams in the City conference room. The interview was recorded. The City's report expressly cautioned that "[e]ach and every word spoken is not memorialized here" and directed the reader to "[d]efer to audio recording for actual words and statements."

34. At Mr. Adams's request, a DOL-VETS investigator participated by telephone. The City's report stated that the investigator acted as "de-facto legal representation for Adams" and "essentially threatened the City of Whittier with Federal Investigation from the US Attorney's Office" if the City acted contrary to USERRA.

35. According to The City's report, the VETS investigator explained that Mr. Adams could not be disciplined based on whether his service was "voluntary" or "voluntold." The City

responded that the investigation concerned dishonesty rather than military service, and the VETS investigator "maintained a status of disagreement."

36. Before the interview, Lt. Herrod prepared six questions for Mr. Adams. The first three concerned whether Mr. Adams's military assignment was voluntary and the circumstances under which he accepted it. The final three concerned Mr. Adams's communications with WPD and whether those communications were truthful.

37. During the interview, the VETS investigator explained that Mr. Adams could not be disciplined based on whether his military service was voluntary or involuntary. Following that explanation, Lt. Herrod did not ask the first three questions and proceeded instead with the final three questions, which were: "text messages indicate you intentionally withheld the information regarding your assignment"; "[a] news article was posted publicly with a statement from you that you did volunteer, this contradicts what you had previously maintained that you were being ordered to go and being 'called up'"; and '[w]hy would you be untruthful about the circumstances of the assignment?... [y]ou had no reason to be untruthful about anything."

38. The City's report further states that Mr. Adams was asked only one substantive question: "why he was untruthful about his assignment orders." The question thus assumed the disputed conclusion that Mr. Adams had been untruthful, which is the same conclusion Lt. Herrod had already recorded before the interview. The report by Lt. Herrod declared that "[t]he complaint is sustained" and that "Adams admits being untruthful." He then designated the case status as "[r]eferred to City of Whittier Administration for personnel action."

39. On January 14, 2026, Lt. Herrod, City Manager Jackie Wilde, and Officer Tim Sampson arrived at the Girdwood WPD substation at approximately 5:30 a.m., near the end of Mr. Adams's shift. WPD Officer Lloyd Willis was also present because he had agreed to cover for Mr.

Adams while Mr. Adams attended National Guard training later that morning.

40. Wilde presented Mr. Adams with a *Loudermill* notice stating that the City intended to terminate his employment and placed him on administrative leave. The City directed Mr. Adams to surrender City property before leaving the station.

41. Mr. Adams returned the property he could locate at the station but could not immediately locate one door-access card and one badge. He later found those items in a bag at his home and returned them at the *Loudermill* hearing.

42. The *Loudermill* hearing was attended by Ofc. Wilde and human-resources consultant Gladys Zevalos. Mr. Adams provided his account of the disputed events, but the City asked no follow-up questions and undertook no further investigation before proceeding with the termination decision.

43. During the pretermination process, the City expanded the asserted grounds for discipline beyond the allegation investigated by Lt. Herrod. It added purported "accountability issues" arising from the access card and badge, as well as an allegation that Mr. Adams had made an unauthorized schedule change.

44. The disputed schedule change concerned National Guard medical training at Joint Base Elmendorf-Richardson that Mr. Adams needed to maintain his qualification as a combat medic. Mr. Adams had informed Lt. Herrod of the conflict, explained that the training could not be rescheduled, and asked to coordinate coverage with Ofcs. Willis and Sampson. The adjustment required Mr. Adams to leave approximately one hour early, coverage was arranged, and comparable scheduling adjustments had previously occurred among WPD officers.

45. Neither the scheduling allegation nor the alleged accountability issues were included in Lt. Herrod's January 8 Notice of Investigation addressed during the January 9

interview, which concerned only Mr. Adams's military assignment and communications about that assignment.

46. On January 21, 2026, the City terminated Mr. Adams's employment, characterizing the decision as based on honesty, conduct, and accountability rather than military service. Although the sustained investigation concerned Mr. Adams's military orders, military-leave notice, and preliminary communications about military service.

47. Mr. Adams had requested DOL-VETS assistance before his termination, and a VETS investigator participated in the January 9 interview. After the City terminated him, Mr. Adams notified VETS and pursued his complaint concerning the termination.

48. VETS investigated the City's assertion that Mr. Adams had possessed several weeks of advance knowledge of the assignment. VETS found that assertion "is not accurate" and reported that the National Guard State Director had confirmed "that this was a last-minute state assignment." VETS further found that Mr. Adams was not informed that he had been selected until the November 10 AKARNG meeting.

49. VETS determined that Mr. Adams "would not have been terminated from employment if not for his military service obligation" and that "his service was a motivating factor in the termination." VETS further concluded that the City's reliance on "false statements & dishonesty could possibly be considered a pretext."

50. VETS found the City out of compliance with 38 U.S.C. § 4311(a) and § 4311(b) and requested that the City reinstate Mr. Adams to his position with back wages from the date of termination. The City did not provide that relief, and VETS closed the matter without resolution after determining that Mr. Adams's allegations were meritorious.

51. Mr. Adams remained substantially unemployed from January 21, 2026 until April

20, 2026, when he obtained employment as a paramedic. As a result of the City's actions, he has sustained lost wages, overtime and on-call compensation, retirement contributions, employment benefits, and other economic losses. His replacement employment does not provide an employer retirement contribution equivalent to the benefit he received from the City.

52. As a direct and proximate result of the City's actions, Mr. Adams has suffered and will continue to suffer lost wages, overtime compensation, on-call compensation, lost retirement contributions, associated investment earnings, PERS service and vesting opportunities, employment benefits, and other economic damages in amounts to be proven at trial.

**COUNT I**
**VIOLATIONS OF 38 U.S.C. §4301 *et seq*.**

53. Mr. Adams incorporates by reference the allegations contained in Paragraphs 1 through 52 as if fully restated herein.

54. USERRA prohibits "discrimination against persons because of their service in the uniformed services." 33 U.S.C. §4301(a)(3).

55. Section 4311(a) of USERRA states in relevant part, that a person "who is a member of… performs, has performed,…or has an obligation to perform service in a uniformed service shall not be denied… *reemployment*, *retention in employment,*… or any benefit of employment by an employer on the basis of that membership,… performance of service, or obligation." (italics added).

56. Section 4311(c) further provides, in relevant part, that "[an] employer shall be considered to have engaged in actions prohibited… if the person's membership… or obligation for service in the uniformed services is a motivating factor in the employer's action."

57. A "benefit of employment" is defined as:

The term 'benefit', 'benefit of employment', or 'rights and benefits' means the

> terms, conditions, or privileges of employment, include any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations and the opportunity to select work hours or location of employment.

38 U.S.C. §4303(2).

58. USERRA's definition of "service in the uniformed services" covers all categories of military training and service, including duty performed on a *voluntary* or *involuntary* basis, in time of peace or war. 38 U.S.C. §4312(e)(1)(A)(i); 20 C.F.R. §1002.115. (italics added).

59. Pursuant to regulations promulgated by the U.S. Department of Labor, an employer's obligation to promptly reemploy a servicemember means as soon as practicable under the circumstances of the case and is expected to occur within two weeks of the employee's application for reemployment. 20 C.F.R. § 1002.181.

60. Mr. Adams's membership in the AKARNG, performance of military service, and continuing military obligations were substantial or motivating factors in the City's decision to investigate him, place him on administrative leave, and terminate his employment.

61. The City's discriminatory motive is evidenced by its prior unlawful reprimand concerning military leave, its demand for information from Mr. Adams's military command, its admitted prior noncompliance with USERRA, the staffing concerns caused by his military absence, its focus on whether his service was voluntary, the prejudgment and pretext of the internal investigation, the close temporal proximity between his military service and termination, and the addition of new termination grounds during the disciplinary process.

62. The City's asserted dishonesty rationale was pretextual because Mr. Adams's assignment was not confirmed until November 10, he promptly notified WPD when the assignment became definite, his statement that he had been called to state active duty was true,

and voluntary military service is protected under USERRA.

63. The City further retaliated against Mr. Adams for exercising and enforcing his USERRA rights. Mr. Adams engaged in protected activity by objecting to Chief Achee's military-leave demands, filing and pursuing his October 22 grievance, exercising his right to take military leave, asserting USERRA during the January investigation, requesting assistance from VETS, and participating in the January 9 interview with a VETS investigator.

64. In response to Mr. Adams's protected activity, the City reopened substantially the same military-notice and command-communication issues resolved by the grievance, assigned the resulting investigation to a participant in the disputed conversation, reached a finding before interviewing Mr. Adams, continued its disciplinary action after VETS intervened, disparaged VETS' participation, placed Mr. Adams on administrative leave, expanded the asserted grounds for discipline, and terminated his employment.

65. The close temporal proximity, the involvement of officials who knew about the successful grievance, the renewed focus on military-notice issues, the prejudgment of Mr. Adams's credibility, the hostility toward VETS' participation, and the expansion of the asserted termination grounds establish that Mr. Adams's protected activity was a motivating factor in the City's actions.

66. The City's violations were knowing because it had investigated the governing law, sustained Mr. Adams's grievance, acknowledged his USERRA rights, and still proceeded despite VETS' contemporaneous warning. Defendant was aware of its obligations under federal law.

67. As a direct and proximate result of the City's conduct, Mr. Adams has suffered past and future losses of wages and employment benefits in amounts to be proven at trial.

68. Pursuant to 38 U.S.C. § 4323(d)(1)(D), Mr. Adams requests liquidated damages in the greater amount of $50,000 or an amount equal to his lost wages, benefits, and statutory interest.

69. Pursuant to 38 U.S.C. § 4323(d)(1)(C), Mr. Adams requests interest on the amount of lost wages and employment benefits found due.

70. Pursuant to 38 U.S.C. § 4323(h)(2), Mr. Adams requests reasonable attorney fees, expert-witness fees, and other litigation expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, based upon the foregoing, Plaintiff prays for the following relief against Defendant:

1. Declaration that Defendant's actions and practices complained of herein are unlawful and in violation of USERRA, 38 U.S.C. §4301, *et seq*.;

2. Require that Defendant fully comply with the provisions of USERRA by providing Plaintiff all employment benefits denied to him as a result of the unlawful acts and practices as complained herein.

3. Appropriate front pay and equitable relief because reinstatement is not feasible.

4. Removal of the investigation, administrative leave, termination, and related adverse material from Mr. Adams's employment records.

5. Fees and expenses, including attorneys' fees pursuant to 38 U.S.C. §4323(h)(2);

6. Award Plaintiff prejudgment interest on the amount of lost wages or employment benefits found due;

7. Order that Defendant pays liquidated damages in an amount equal to the amount of lost compensation and other benefits, or fifty thousand dollars ($50,000), whichever is greater, suffered by reason of Defendant's knowing violation of USERRA;

8. Grant an award for costs of suit incurred; and

9. Grant such other further relief as may be just and proper, and which Plaintiff may be entitled to under all applicable laws.

Dated: September 25, 2026

*/s/Brian J. Lawler*

Brian J. Lawler, CA SBN 221488
*(Pro Hac Vice* pending)
**PILOT LAW, P.C.**
4632 Mt. Gaywas Dr.
San Diego, CA 92117
Telephone: (619) 255-2398
Email: blawler@pilotlawcorp.com

Kevin L. Wilson, KBA No. 96888
*(Pro Hac Vice* pending)
**KEVIN WILSON LAW PLLC**
517 West Ormsby Ave.
Louisville, KY 40203
Tel: (502) 276-5050
Email: kevin@klwilsonlaw.com

*Attorneys for Plaintiff,*
Bradley Steven Adams

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues triable as of right by a jury in this Complaint pursuant to Federal Rule of Civil Procedure 38(b).

Dated: September 25, 2026

*/s/Brian J. Lawler*

Brian J. Lawler, CA SBN 221488
*(Pro Hac Vice* pending)
**PILOT LAW, P.C.**
4632 Mt. Gaywas Dr.
San Diego, CA 92117
Telephone: (619) 255-2398
Email: blawler@pilotlawcorp.com

Kevin L. Wilson, KBA No. 96888
*(Pro Hac Vice* pending)
**KEVIN WILSON LAW PLLC**
517 West Ormsby Ave.
Louisville, KY 40203
Tel: (502) 276-5050
Email: kevin@klwilsonlaw.com

*Attorneys for Plaintiff,*
Bradley Steven Adams